# CHARLESTON.

## NUZUM v. HERRON.

Submitted June 10, 1902.    Decided March 21, 1903.

1. JUSTICE—*Judgment.—Lien.*

   Under section 5, chapter 139, Code, a judgment for money rendered by a justice against any person is a lien from the date of said judgment, on the real estate of or to which such person shall be possessed or entitled, at or after such date. (p. 513).

2. JUDGMENT.

   But such judgment is not a lien on real estate as against a purchaser thereof for valuable consideration, without notice, until the same is docketed in the judgment lien docket in the office of the clerk of the county court as provided in section 4, chapter 139, Code.   (p. 514).

3. JUDGMENT—*Confession—Appellate Court.*

   Where the confession of a judgment before a justice is alleged in the bill giving date and amount.and admitted by defendant in his answer and proved in the cause by oral testimony without objection or exception, the question of the sufficiency of the proof of the existence of such judgment because the record of it was not produced cannot be raised the first time in the appellate court.   (p. 516).

4. JUDGMENT—*Lien· Docket—Limitation.*

   Where a judgment by confession amounts to a preference under section 2, chapter 74, Code, and has not been docketed in the office of the clerk of the county court in the judgment lien docket as provided in section 4, chapter 139, Code, a creditor is not limited to four months in which to attack it by suit as a preference.   (p. 514).

5. LIMITATION—*Docket.*

   *Quaere:* Whether, when so docketed the creditor must sue within four months thereafter?

Appeal from the Circuit Court, Randolph County.

Action by Staatz Nuzum against J. A. Herron, *et als.*  Judg-ment for defendants, and plaintiff appeals.

*Affirmed in part.   Reversed in part.*

W. S. Meredith, for appellants.

Scott, Cobb & Maxwell, for appellees.

McWhorter, President:

On the 14th day of May, 1894, James A. Heron purchased from Staats Nuzum a stock of goods and merchandise at the village of Colfax, in Marion County, for the sum of two thousand, three hundred and sixty four dollars and twenty cents, paying in cash or its equivalent four hundred and fifty dollars, and made his two notes signed by himself, Helen Herron and M. L. Herron, dated the 19th day of May, 1894, one for one thousand dollars to be paid in payments of one hundred dollars each on or before the 19th day of May in each year thereafter, in the years 1898 to 1907, inclusive, with interest from date; whole interest to be paid annually; the other for nine hundred and fourteen dollars and twenty cents to be paid in annual payments of one hundred and thirty dollars and sixty cents each, payable on the 19th day of May of each year from 1908 to 1914, inclusive, with interest from date, whole interest to be paid annually. In addition to the said notes said James A. Herron made and delivered to said Nuzum the following agreement:

"ARTICLE OF AGREEMENT made this the 19th May, 1894, between James Archiable Herron, of the first part and Staats Nuzum, of the second part, first party of the county of Randolph County, party of the second of the county of Marion, West Va. Witness, that the party of the first part doth covenant with the party of the second part that he has in his own possession as is assessed in his own name Three Hundred and eleven acres of land situated in the county of Randolph assessed at or about One Thousand Dollars for which he claims to be worth $2000.00. And hereby binds himself in the sum of Five Hundred, if the above statement is not about as stated by him and also to deliver the store with all the goods therein, to the party of the second. The above $500.00 to be paid to the party of the second.

· Signature—                 J. A. Herron."

Said Herron took possession of the stock of goods and carried on the mercantile business under the firm name of J. A. Her-

ron & Co., Helen Herron, the wife of M. L. Herron, being the partner representing the company. Payments were made on the first note and endorsed thereon May 22, 1895, "sixty dollars being interest for the first year," and June 15th, 1896, "sixty dollars being interest to May 19th, 1896," and on the second note are credits of four dollars. May 22, 1895, "by fourteen dollars and eighty-five cents being balance of first year's interest;" June 15, 1896, "by fifty-four dollars and eighty-five cents being interest to May 19, 1896," which are all the payments that were made on either of said notes. On the 31st day of January, 1899, James A. Herron and Susan F. Herron, his wife, in consideration of one hundred dollars conveyed by deed to Stella J. Herron fifty acres of the three hundred and eleven acres mentioned in the agreement of the 19th of May, 1894, which deed was recorded on the 7th day of February, 1899, and on the same 31st day of January, 1899, they conveyed to French C. Herron in consideration of one hundred and fifty dollars, fifty dollars paid in hand and fifty dollars to be paid on or before the first day of January, 1900, and fifty dollars to be paid on or before the first day of January, 1901, to be paid in work another fifty acres more or less of said tract of land, which deed was recorded February 17, 1899; and on the first day of April, 1899, James A. Herron and wife in consideration of three hundred and forty-eight dollars to be paid as set out in the deed in three payments of one hundred dollars, one hundred dollars and one hundred and forty-eight dollars, to be paid respectively on the first days of June, 1900, and 1901, and 1902, conveyed to Jacob W. Cutright forty-three and one-half acres of said tract of land, retaining a lien for the purchase money, which deed was recorded April 5, 1899, and on the 3d day of April, 1899, said James A. Herron and wife in consideration of one thousand and fifty-two dollars, to be paid two hundred dollars on or before the first day of October, 1900, three hundred and forty-eight dollars on or before October 1, 1901; three hundred and forty-eight dollars on or before the first day of October, 1902; and one hundred and sixty dollars on or before October 1, 1903, reserving their vendor's lien for the purchase money on the property sold, conveyed to Harriet M. Cutright one hundred and sixty-eight acres of said tract of land. On the 22d day of April, 1899, Staats Nuzum

sued out of the clerk's office of the circuit court of Randolph County his summons in chancery against James A. Herron, M. L. Herron, Helen Herron, Susan F. Herron, Stella J. Herron, French C. Herron, Harriet M. Cutright, and Jacob W. Cutright, and filed his affidavit for an attachment and caused his order of attachment to be levied upon the said two tracts of fifty acres each so conveyed, and designated Harriet M. Cutright and Jacob W. Cutright and French C. Herron as being indebted to the defendant, James A. Herron and cited them to appear and answer as to their indebtedness, and at the June rules said Nuzum filed his bill setting up the sale to Herron of the stock of goods and filed therewith the statement or agreement in writing of the said Herron dated May 19, 1894, claiming to be the owner of said tract of three hundred and eleven acres of land, alleging that he gave credit to said Herron for said stock of merchandise upon his representation of his solvency and the ownership of said real estate; that the said James A. Herron upon taking possession of the stock of goods decided to carry on the business at the village of Colfax in the name of J. A. Herron & Co., which copartnership was composed of said Herron and his daughter-in-law, Helen Herron, but the business was principally done by Helen and her husband, M. L. Herron. The business continued until the first of April, 1899, when the stock of goods was allowed to become small by reason of sale and not replenished and then said M. L. Herron and wife secretly removed the stock on hands as well as their other effects to the State of Ohio and alleging that said James A. Herron, who was a farmer and residing on the three hundred and eleven acres of land about the first of the year 1899, fraudulently commenced to dispose of said land in such manner as to prevent plaintiff from compelling payment of his debts; that Stella J. Herron, to whom he conveyed fifty acres was the wife of one of his sons and French C., to whom he conveyed the other fifty acres was his son; that on the 20th of May, 1899, a deed was recorded from defendant, Stella J. Herron and her husband, B. D. Herron to the defendant, French C. Herron for the fifty acres which was conveyed to Stella by James A. Herron and wife, which deed from Stella and her husband was dated March 15, 1899, and recites the consideration to be one hundred and fifty dollars paid in hand. Copies

of all of said deeds are exhibited with the bill. Plaintiff alleges
that he is not advised whether the sales and conveyances to
Jacob W. Cutright and Harriet M. Cutright were *bona fide*
and for valuable consideration or not, but alleges that such
sales were made by Herron to defraud plaintiff out of the col-
lection of his debt; and that if notes were given by the Cut-
rights they were intended by James A. Herron to be disposed
of in a fraudulent manner so as to prevent plaintiff from reach-
ing the proceeds of the sales and thereby realize upon said
notes; and that plaintiff had been informed that such notes
were taken and had been with fraudulent intent assigned by
James A. Herron to his wife, defendant Susan F. Herron and
alleging that the conveyances to Stella J. Herron and French
C. Herron of the two fifty acre tracts were fraudulent and
made by said James A. Herron to hinder, dealy and defraud
plaintiff in the collection of his debt and that said Stella and
French had notice of such fraudulent intent, and alleging that
in furtherance of his fraudulent intent, James A. Herron went
before W. S. Woodford, a justice of Randolph County, and con-
fessed a judgment in favor of his wife on the 15th of Decem-
ber, 1898, for the sum of three hundred and twenty-seven
dollars and forty-eight cents, and on the 27th day of De-
cember, 1898, before the said justice he confessed another
judgment in favor of his wife for three hundred dollars, and
on the 20th of February, 1899, he confessed another judgment
in favor of his wife for two hundred and eighty-six dollars
and twenty-five cents, which judgments had been paid by the
said Herron to his wife by assigning to her notes taken by him
from the purchasers of said land sold to the Cutrights or one
of them; that said confession of said judgments and any as-
signment of any of said purchase money notes to his wife for
the pretended purpose of paying off said judgments by the said
James A. Herron were fraudulent and without consideration
deemed valuable in law, against the rights of plaintiff, of which
fraudulent intent Susan F. Herron had notice and sets up his
attachment and the service of it, and alleging that if the con-
veyances to the Cutrights should be held to be valid then the
purchase money for the land so conveyed is liable to be applied
to the payment of plaintiff's debt; that neither the defendants,
Helen nor M. L. Herron own any property in the State of West

Virginia nor is James A. Herron the owner of any other property in the State than the purchase notes, and alleges that said James A. Herron was insolvent and that all his property would not pay all his debts on the 16th of December, 1898, at the time of the confession of judgment in favor of his wife, and that if this fact should be made to appear from the proofs then the said confession of judgment should be held to be an assignment by James A. Herron of all his property for the benefit of plaintiff and all other creditors who might come into this suit and contribute to the expense thereof, and praying for an injunction restraining said James A. Herron and his wife, Susan F. Herron or either of them from assigning or transferring any of the notes of the Cutrights or Herrons given for the purchase of said lands; and that any assignments that might be made of any of said notes should be set aside and the proceeds of the sales, as far as the same might be held to be valid should be applied to the debts of plaintiff and any of said sales that might appear to be fraudulent and invalid as against plaintiff should be set aside and the conveyances for said land annulled and the land decreed for sale and proceeds applied to plaintiff's debt, or if it should be made to appear that said James A. Herron was insolvent on the 16th day of December the time of the confession of the judgment in favor of his wife, all of his property then owned by him should be applied to the payment of plaintiff's debt and the other debts then existing against him, and for general relief. Susan F. Herron filed her answer to the bill denying all personal knowledge of the indebtedness of her husband, James A. Herron to the plaintiff and denying any interest in the conveyances to Stella and French except that if such conveyances should be set aside the land so attempted to be conveyed should be subject to James A. Herron's indebtedness to her, denying that the sales and conveyances to the Cutrights mentioned in the bill were made by James A. Herron for the purpose of hindering, delaying or defrauding the plaintiff or any creditor of said James A. Herron but the said sales and conveyances were made in good faith and without any such fraudulent purpose; that it was true James A. Herron took from the Cutrights notes for the purchase price of the land aggregating one thousand four hundred dollars and assigned said notes to respondent, but denied that such assign-

ment was for any fraudulent purpose; and that if he had such fraudulent purpose in either transaction she had no knowledge of it and could not be affected by it; that at the time of the assignment of said notes she had no knowledge of the indebtedness of said James A. Herron to the plaintiff and did not know that such indebtedness existed; that she had heard in a general way of the purchase of the stock of goods but did not know that her husband was indebteded for the same at the time of the assignment of the notes to her; that it is true the several judgments were rendered in her favor against her husband for the amount and at the times mentioned in the bill and that another judgment was rendered in her favor against him on the 4th day of May, 1891, for about one hundred and seventy-three dollars with interest from that d ate which was not mentioned in the bill, but denied that any of such judgments were gotten for the purpose of hindering, delaying or defrauding the plaintiff but avers that said James A. Herron was justly indebted to her in the full amount of all of said sums at the time they were rendered for money borrowed from her by him or for money actually expended by her for him at his special interest and request and always as a loan and which were always so recognized, for all which said James A. Herron always executed his note to respondent at the time of the loan or very shortly thereafter in accordance with the express agreement between them at the time of the loan and avers that at the time of the assignment to her of the notes James A. Herron was indebted to her in the sum of over one thousand one hundred dollars; that she had before the deeds to the Cutrights were executed joined in other deeds conveying portions of her husband's lands and had gotten no benefit therefrom and as he proposed to dispose of all his real estate she refused to join in a deed therefor  unless she received compensation for the surrender of her contingent right or dower and said notes were assigned to her in payment of his indebtedness to her and in consideration of her signing the deeds thereof as satisfaction of such indebtedness, the residue was not as much as she demanded for the surrender of her contingent right or dower. Respondent avers that she was married to Herron, September 30, 1886, then thirty-six years of age, that she then owned or used and controlled an individual interest in a valuable farm

in the county of Lewis, and personal property of considerable value, consisting of live stock and some money, part of which was loaned out and bearing interest; that a portion of the live stock she brought afterwards to her husband's farm in Randolph County; that there was increase of such live stock and that since her marriage she had continued to deal more or less in live stock buying and selling, sometimes keeping stock on her husband's place and sometimes on her own place in Lewis County; the same having been partitioned among the owners shortly, after her marriage, the portion allotted to her being about sixty acres; that from that place she had realized in money about forty dollars per year since her marriage, most of which from time to time she loaned out that it might draw interest; that all of the money loaned to or expended for her husband was her own separate estate derived from other sources and none of it was furnished by or belonged to him; that since her marriage she has continued to manage her own property and business and having children of her own she felt that she ought to preserve for them what property she had and increase it as much as she could for their benefit and her own, and denied all fraud and collusion and prayed that the injunction be dissolved and the attachment quashed and dismissed.

. Defendant, James A. Herron filed his demurrer and answer and says that after purchasing the goods he and Helen Herron, his son's wife entered into a partnership for carrying on the business of merchandising, which was committed to said Helen and her husband and respondent knew but little about the bussiness from that time until it was closed out in the year 1899; that on one or more occasions while the business was being carried on he sent to Helen Herron or her husband small amounts of money to be used for the payment of goods purchased for the store; that he knew nothing of the purpose of Helen or her husband to close out when it was done or to remove the goods from Colfax; that he has since been informed that M. L. Herron claiming to act for the firm, borrowed money from his sister, K. F. Snyder, to be used in the business and executed to her the notes of the firm for the money and finally sold the remainder of the stock to her in satisfaction of said indebtedness receiving one hundred dollars, the excess of the valuation of the goods over the amount due her for the

money borrowed, that he knew nothing of it until after it was consummated; admitted that he made the paper of May 19, 1894, and believed it was true when made, and that the statement was made in good faith; avers that respondent's health was very much impaired and he was unable to manage or work the small farm on which he was living; that his son French C. Herron was living in Indiana and in the fall of 1898, respondent requested his son to come back home and work on the place and as an inducement offered to pay him fifty dollars or give him the value of fifty dollars in land; that French accepted his offer and came home and the deed was executed accordingly and French in pursuance of his undertaking remained with the respondent and worked upon the farm until it was sold to the Cutrights; that Stella J. Herron was living in Pennsylvania, that respondent was anxious that she and her husband, respondent's son should come and reside near him and promised her one hundred dollars in money or fifty acres of land if she and her husband would move back from Pennsylvania, which she consented to do and the deed was made and delivered, but his daughter has not yet come back to Randolph County, having stopped in Marion County; he admits the sales were made to the Cutrights and notes taken for the several amounts and the same assigned to his wife, Susan F. Herron in satisfaction of his indebtedness to her and in consideration of her joining in said deeds so as to release her contingent dower in the lands; that respondent was justly indebted to his wife in the sum of over one thousand one hundred dollars, nearly all of which was for money borrowed of her, which money was all her separate estate and none of which had been furnished her by him; that before she had executed the last deed she demanded three hundred dollars of the purchase price as a consideration, which respondent claimed she should have and therefore all the notes taken for the purchase money were assigned to her and were not sufficient to satisfy his indebtedness to her and pay her the three hundred dollars for joining in the deed; denies that the real estate was sold or notes assigned with fraudulent intent; that at the time of their marriage his wife had personal and real property of her own, that she owned or controlled an interest in a valuable farm lying mostly in Lewis County; that in 1887, the year fol-

lowing their marriage her interest in the farm was laid off to her and consisted of sixty acres, which she had owned ever since; that no money or means of respondent ever went into said real estate, but the same was acquired by his wife entirely independent of him; that the several judgments mentioned in the plaintiff's bill, also one other before Justice Rader on the 4th of May, 1891, for about one hundred and seventy-three dollars, were obtained by his wife and that he was justly indebted to her in the several sums for which said judgments were obtained when so obtained, and that no part of the farm nor the debts for which they were obtained had been paid when he assigned the notes of the Cutrights to his wife; that at the time of their marriage his wife had money either in hand or owing by responsible parties to the amount of nearly three hundred dollars, and also considerable live stock; that as much as ten or twelve years before their marriage his said wife engaged to a greater or less extent in raising, buying and selling live stock and has ever since continued to do so on her own account with her own means, not furnished by respondent; that from time to time since their marriage respondent had borrowed money from his wife, always contracting to repay the same and finally giving his notes for the amounts so borrowed at the time or shortly afterward and the aggregate of the amount of such indebtedness was represented by the amounts of the several judgments; that if there could be any question as to the validity of said judgments yet the indebtedness upon which said judgments were based was *bona fide* and still existing at the date of the assignment of the notes and constituting a valid consideration for such assignment to the amount of such indebtedness, and denying each and every allegation of fraud and of collusion for the purpose of hindering, delaying, or defrauding the plaintiff in the collection of his debt. Defendants, J. W. Cutright and Harriet M. Cutright filed their respective answers admitting the purchases made by them, averring that they had purchased in good faith for a fair consideration, and that they knew nothing of the indebtedness of James A. Herron except as to the judgments in favor of his wife, which Herron was to satisfy by the assignment of the notes for the purchases of respondents, which he did, and denied all the allegations of fraud, unlawful combination and confederacy con-

tained in the bill and all collusion for the purpose of defraud-
ing, hindering and delaying, plaintiff or any one else.

Depositions were taken and filed in the cause and the cause
was heard on the first day of February, 1901, upon the bill
taken for confessed as to all the parties except the defendants,
James A. Herron, Susan F. Herron, H. M. Cutright and
Jacob W. Cutright, upon the answers and replications thereto
and upon the exceptions of plaintiff to the deposition of Susan
F. Herron and upon the order of attachment sued out and
levied and upon the joint petition of creditors McCoy Shoe Co.
and others filed on the 28th day of October, 1899, praying to
be made parties to this cause. The court overruled the excep-
tions taken to the deposition of Susan Herron and set aside as
fraudulent the deeds to French C. Herron and Stella J. Herron
and from Stella J. Herron and her husband to French C. Her-
ron and held that by reason of the institution of this suit and
the levying of the attachment on the two tracts of fifty acres
each, plaintiff had a prior lien thereon for the amount of his
debt against James A. Herron and that said tract should be
sold to pay said debt. "And it further appearing to the court
from the pleadings and proofs in the cause that the said James
A. Herron, was justly indebted to the said Susan F. Herron, at
the time he assigned and transferred to her the said notes of
Jacob W. and Harriet M. Cutright, to the amount of said
notes, and that such notes were assigned to her in payment and
satisfaction of such indebtedness. And the court being of
opinion that such assignment and transfer was made in good
faith to satisfy a *bona fide* debt, doth refuse to set aside such
transfer, and the court doth dissolve the injunction hereto-
fore awarded herein, so far as the same affects the right of said
Susan F. Herron, to collect or transfer said note. And the
court doth quash the attachment of the plaintiff herein, so far
as the same affects the said notes or the funds payable thereon,
and the said Susan F. Herron, is authorized to collect or trans-
fer the said notes of Jacob W. Cutright and Harriet M. Cut-
right, free from the claims of the plaintiff or the other cred-
itors of the said James A. Herron."

The court further decrees that the conveyance of the forty-
three and one-half acres to Jacob W. Cutright of April 1, 1899,
and of the one hundred and sixty-eight acres to Harriet M.

Cutright of April 3, 1899, were made in good faith and for valuable consideration without notice of any indebtedness or claim on the part of the plaintiff or any creditor of said Herron; said conveyances were held to be legal and valid and the cause was referred to a commissioner of the court with directions to ascertain and report the valid debts existing against the said James A. Herron to whom owing and the amounts thereof and their priority, if any, and to report any other pertinent matter. From this decree the plaintiff, Staats Nuzum, appealed.

The first assignment of error is that the court erred in refusing to sustain the exceptions of appellant to the deposition of Susan F. Herron and permitting same to be read in evidence in her behalf. It appears from the record that when the witness, Susan F. Herron was dismissed from the witness stand after agreeing to produce the notes that were assigned to her by her husband and to return for further examination it was under this agreement "By agreement of counsel appearing to these depositions the same are to be filed with the understanding that the witness will return when requested by her counsel to be further examined, the re-direct and probably the cross examination not being completed." The exception taken to the deposition is by the plaintiff for the reason that she never returned to have her deposition completed and never filed the notes, deeds and other papers as a part of her deposition which she promised under oath to do. There is nothing in the record to show that her counsel ever requested her to return according to the terms of the agreement nor does it appear that the plaintiff ever required her appearance again as a witness. The only notes or writings witness promised to produce were the Cutright notes and this was at the request of her own counsel; the plaintiff never called for any of the papers named in the exception.

The 2, 3, 4, 5 and 6 assignments are as follows:

"*Second:* The court erred in quashing said attachment in so far as the same was quashed.

*Third:* The said court erred in dissolving said injunction.

*Fourth:* The said court erred in refusing to set aside the assignment of said promissory notes made by the said James

A. Herron to his wife, and in not subjecting the said notes to the payment of plaintiff's claim.

*Fifth:* The court erred in not adjudging that the said confession of judgment made by the defendant, James A. Herron for the benefit of his wife on the 16th day of December, 1898, while the said James A. Herron was insolvent, operated, and should be taken and construed as an assignment made by the said James A. Herron for the benefit of all his creditors.

*Sixth:* For other errors apparent upon the face of the record."

These several assignments of error may be properly considered as one. The fifth raising the principal question involved in this case; and if this is well taken then it follows that the third assignment must be sustained and the fourth also to the extent that the court erred in refusing to set aside the assignment by James A. Herron to his wife of the purchase notes, and that these said notes should have been applied to all the indebtedness of James A. Herron, *pro rata.* I take it from the assignments of error by the appellant as well as from the brief of the appellee that there is no disposition to question the validity of the sales and conveyances to the said Cutrights; the only question remaining, what is a proper disposition to be made of the proceeds of the sales of the Cutrights and of the lands, two tracts of fifty acres each, found to be fraudulently, conveyed by James A. Herron and wife to French C. Herron and Stella J. Herron, respectively. The insolvency of James A. Herron at the time of confessing the judgment on the 16th of December, 1898, is charged in the bill and is not denied and his insolvency clearly appears from the proof in the record. Section 2, chapter 74, Code, defines what the word "Charge" shall there be taken to mean. In that section it says: "The word 'charge' shall be taken to include every confessed judgment, deed of trust, mortgage, lien and encumbrance." Said section further provides: "Every transfer or charge made by an insolvent debtor attempting to prefer any creditor of such insolvent debtor or to secure such creditor or any surety or endorser for a debt to the exclusion or prejudice of any other creditor, shall be void as to such preference or security, but shall be taken to be for the benefit of all creditors of such debtor, and all the property so attempted to be transferred or

charged shall be applied and paid *pro rata* upon all the debts owed by such debtor at the time such transfer or charge is made; provided that any such transfer or charge by an insolvent debtor shall be valid as to such preference or priority unless a creditor of such insolvent debtor shall institute a suit in chancery within one year after such transfer or charge was made to set aside and avoid the same and cause the property so transferred or charged to be applied toward the payment *pro rata* of all the debts of such insolvent debtor existing at the time such transfer or charge is made subject, however, to the provision hereinafter contained with reference to creditors uniting in such suit and contributing to the expense thereof. But if such transfer or charge be admitted to record within eight months after it is made then such suit to be availing must be brought within four months after such transfer or charge was admitted to record." This provision of the statute is plain and unambiguous. The first judgment was confessed December 16, 1898, which was followed in quick succession by two others, December 27, 1898, and February 20, 1899, the three judgments amounting in the aggregate to nine hundred and thirteen dollars and seventy-three cents; this was clearly an attempt on the part of James A. Herron to give preference to Susan F. Herron, his wife, over his other creditors and to secure her in the payment of her claims by creating liens upon, or charges against his real estate in her favor in violation of the statute just quoted, which says that such attempted charge "Shall be void as to such preference or security but shall be taken to be for the benefit of all creditors of such debtor, and all the property so attempted to be transferred or charged shall be applied and paid *pro rata* upon all the debts owed by such debtor at the time such transfer or charge is made." It is contended by appellee that the judgments confessed were no liens upon the property because they had not been entered in the judgment lien docket of the clerk's office of the county court and cites, *Dysart* v. *Branderth*, 23 S. E. 966 (N. C.), where it is held: "After a judgment of a justice of the peace has been docketed in the superior court it becomes a lien on all defendant's realty in the county where it is docketed." This decision is under a statute of the State of North Carolina doubtless, which provides that such docketing

is necessary to constitute such judgment a lien, for it is in that case said by the judge rendering the opinion that "A justice's judgment when duly docketed in the office of the clerk of the superior court becomes a judgment of the supreme court to all intents and purposes," but our statute makes every judgment a lien against all real estate of the judgment debtor, except as against a purchaser for value without notice. Under section 5, chapter 139, Code, these judgments confessed before the justice became liens upon the real estate of said James A. Herron, but not having been entered in the judgment lien docket in the clerk's office of the county court they were not liens as against a purchaser for value, without notice, of said real estate as provided by section 6, chapter 139; but were liens except as against such purchasers and were therefore charges against said real estate as defined in said section 2. It is contended by appellee that there is not sufficient proof of the confession of said judgments; that the record should have been produced or its loss explained and that to admit such evidence is to violate a fundamental rule of evidence. It is true there were no copies of the judgments produced nor offered, but the confessions were alleged in the bill giving the date and amount of each judgment making it certain, and both defendants, James A. Herron and Susan F. Herron, his wife, the beneficiary in these judgments, in their several answers admitted the confession and rendering of the judgments, besides it was proved on cross examination of the debtor, James A. Herron, without exception or objection, and the judgments were also proved by the testimony of the defendant, Sarah F. Herron, the beneficiary in said judgments upon her examination-in-chief by defendant's counsel. That question cannot be now raised in the appellate court for the first time. It is claimed by appellee that the ruling of the Court in *Merchants & Co. v. White-scarvers,* 47 W. Va. 361, is applicable to this case, where it is held: That under section 2, chapter 74, Code, "A mercantile firm although indebted to insolvency may sell its stock of merchandise to a disinterested party and receive his notes in payment therefor payable to its order and assign one or more of said notes in payment of a debt owed by it to a *bona fide* creditor and such transfer will not be void" under said section. This would be applicable to the case at bar, but for the acts of

the defendant Herron, in confessing the several judgments. If no such confession had been made and the defendant, Herron, had sold his real estate to *bona fide* purchasers and taken their notes therefor and assigned such notes to his creditors in payment of *bona fide* debts existing against him, the transaction would have come under the ruling in the *Whitesvarver Case* and be legal and valid, but having confessed the judgments, being insolvent at the time, such confession under the statute was, in effect an assignment of all his real estate, being the property attempted to be charged for the benefit of all his creditors. *Mack* v. *Prince,* 40 W. Va. 324. Defendant Susan J. Herron having preference only for her judgment of May 4, 1891, for one hundred and seventy-three dollars, with interest from that date, the same being a lien upon the said real estate. Appellee contends that the said suit not being instituted within four months after the confession·of judgment on the 16th day of December, 1898, it is too late to avail him under section 2, chapter 74. The judgment not having been docketed in the office of the clerk of the county court, it is clear that the suit could be instituted within a year from the confession. If the judgment had been so docketed the question might have arisen as to whether such docketing constituted a recordation in contemplation of the provisions of said section 2. It appears from the testimony of W. S. Woodford, the justice who rendered the judgment of December 16, 1898, that said judgment was founded on a note given by J. A. Herron to her dated June 26, 1894, which together with other corroborating evidence is deemed sufficient to establish it as a *bona fide* claim against her husband, to be paid *pro rata* with the plaintiff's and other *bona fide* creditors, if any there be, but as to the other two judgments they are held to be fraudulent and not permitted to participate. Althought the defendant, Susan F. Herron, denies in her answer that she had any personal knowledge of the indebtedness of her husband, James A. Herron, to the plaintiff for the goods sold him, Cornelia Nuzum, wife of plaintiff, in her testimony states at length a conversation between James A. Herron and Susan F. Herron and plaintiff and witness, had in relation to the debt of defendant Herron to plaintiff, for the goods, when plaintiff was trying to get Herron to give him security on the notes as it was claimed Herron hal prom-

ised to do, Susan F. Herron refused to go on the notes as security because she said she was afraid that the store debt might take all J. A. Herron owned and then come on her land to finish paying that debt and she wanted her land for her children; that Herron and wife and witness and her husband discussed the debts and all the conditions concerning it including the matter of security on the notes and Mrs. Herron refused to become security for the reason given. She further stated that "Mrs. Herron said that twenty years was good time and gave them a splendid opportunity to pay as large a debt as two thousand and three hundred dollars; she said that they would try and meet their payments of one hundred a year and interest as they became due, but as money matters were as close as they were we ought not to expect them to do any better than to meet their payments as they fell due; she said that they would try and do this but could not do any better;" she further said that she was afraid that it would not pay the indebtedness of her husband; that said M. L. Herron's wife was very extravagant; that M. L. Herron's family lived entirely out of the store, that his wife made so many doctor bills for him to pay out of the store money, that he frequently had doctor bills of fifty dollars each to pay and they kept too many people about them to be kept out of the store, that M. L. Herron credited out too much and that the financial condition at that time all tended to make it uncertain as to the store paying the indebtedness. Witness stated that this conversation took place at witness' home in Colfax in 1895. Mrs. Herron made no denial of this conversation although the way was open for her to have again gone on the witness stand as was provided by agreement that she should, when she left the witness stand without closing her deposition. It is a singular fact that the amount claimed by Susan F. Herron to be paid her by her husband for signing the deeds to the Cutrights, thereby relinquishing her contingent dower was an amount just sufficient, added to the claim she made against her husband for borrowed money to cover the whole amount of the Cutright notes to pay her claim while the amount he paid her for her contingent dower was considerably more than her dower was worth in the purchase money of the real estate, sell-

ing at the price it did, if she had been at that time entitled to receive the dower.

The defendant, Susan F. Herron, not only knew of the indebtedness of her husband, but well knew of his fraudulent purpose to work his property out of his hands and into hers for the purpose of hindering, delaying and defrauding his creditors, and participating in his fraudulent acts joining with him in conveying by deeds of January 31, 1899, fifty acres of land, each to Stella J. Herron, a daughter-in-law, and to French C. Herron, a son, and on the 1st and 3d of April, 1899, respectively, forty-three and one-half acres to Jacob W. Cutright and one hundred and sixty-eight acres to Harriet M. Cutright, the consideration for which two tracts was one thousand and four hundred dollars, for which notes were given and vendor's lien retained to secure the payment thereof, which notes to the amount of one thousand and one hundred dollars were transferred to her in furtherance of his plans to cheat his creditors. The Cutrights being purchasers for valuable consideration without notice except as to the confessed judgments, take good title to the property conveyed to them, their purchase notes being substituted to the benefit of the creditors in lieu of the land, and Susan F. Herron being an active participant in the fraudulent conveyances of the land with full knowledge of the fraudulent intent of said James A. Herron, is not entitled to anything for her contingent dower in the lands so conveyed.

The confession of the judgments by the insolvent defendant James A. Herron, in favor of his wife must be held to be in effect an assignment of his real estate for the benefit of all his creditors to be paid *pro rata,* except as to the judgment of one hundred and seventy-three dollars in favor of Susan F. Herron, which is the first lien on said real estate, and the decree complained of must be reversed in all respects except in so far as it decrees the conveyances by James A. Herron and wife to French C. Herron, dated January 31, 1899, of fifty acres and from said Herron and wife to Stella J. Herron of the same date for fifty acres and the deed of March 15, 1899, from Stella J. Herron and her husband to French C. Herron, made in fraud of the rights of the creditors of James A. Herron; and also in so far as the decree sustains the conveyances

to the Cutrights of forty-three and one-half acres and one hundred and sixty-eight acres respectively, as legal and valid, which conveyances are dated respectively April 1, 1899, and April 3, 1899, and also as to that portion of said decree which refers the cause to a commissioner for the purpose as stated, as to all which matters the decree is affirmed and the cause is remanded to the circuit court for further proceedings therein to be had according to the principles herein and according to the principles governing courts of equity.

*Affirmed in part. Reversed in part.*